# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| ESSELONA JANE LARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-431 PPS |
| | ) | |
| PORTAGE TOWNSHIP SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Esselona Jane Larson was appointed Principal of Myers Elementary School in the summer of 2003.  But if there was any honeymoon period of her tenure, it was a short one, as she soon found herself embroiled in an ongoing conflict with one of the teachers, Diane Zuick, who happened to be Jewish.  Zuick became convinced that Larson, who is Christian, had it out for her because of her religious faith.  Each began building a file of the other's conduct, and Larson's superiors repeatedly intervened in an attempt to mediate.  The situation came to a head in December 2004, when Larson went outside the established chain of command to insist that a traditional Christmas carol be included among the list of songs to be sung at the school's holiday program.  The superintendent suspected that Larson was going out of her way to irritate Zuick, and questioning her decision-making and leadership abilities, he recommended that her contract as principal not be renewed.  The school board followed his recommendation.

Larson then filed this lawsuit against Portage Township Schools ("PTS"), claiming that *she* was the one who was discriminated against on the basis of religion.  PTS has moved for summary judgment, arguing that its failure to renew Larson's contract had nothing to do with her religion, and everything to do with her leadership failures.  Because Larson cannot establish that

Defendant's stated reason for nonrenewal was pretextual, Defendant's motion for summary judgment [DE 25] is granted.

## I. FACTS

In the spring of 2003, Jane Larson applied and was hired for the position of principal at Myers Elementary School, a school of about 500 students and 30 teachers within the Porter Township Schools.  [DE 27-7 at 10.]  Larson's contract began on July 1, 2003.  [*Id*. at 12.] When Larson was hired, Myers was seen as an underperforming school, and she was asked to take leadership of the school and improve implementation of district programs aimed at raising school performance.  [DE 27-2 at 9.]

Soon after she started, Larson found herself in an ongoing personal conflict with one of Myers' teachers, Diane Zuick.  Zuick began keeping a chronology of her encounters with Larson.  [DE 27-8; DE 27-10.]  From the beginning of the school year through the fall, Zuick took issue with Larson's handling of several matters, including her failure to sign off on a teacher's training she had signed up for, and school policy with respect to sending students to the school medical clinic and reporting health information to their parents.  [DE 27-2 at 12-15, DE 27-8 at 13-15.]  In late September, Larson met with Assistant Superintendent Debra Howe to discuss Zuick's behavior.  [DE 27-2 at 14.]  Howe told Larson to "document everything."  [*Id*.]

Things worsened after an incident at a teachers meeting on November 26, 2003.  Larson had been addressing the group about some of the student health policies she had gone over with Zuick.  Larson testified that, when several teachers' hands shot up with questions, she nervously muttered under her breath, "Whoa, that's like Heil Hitler."  [DE 27-2 at 15.]  Zuick wrote that Larson only said, "Heil Hitler," and outstretched her own hand.  [DE 27-8 at 5.]  After the

meeting, another teacher approached Larson and told her that Zuick's parents had been in

Hitler's concentration camps, and that Zuick was upset that she referred to Hitler.  [DE 27-2 at

16.]  Larson later apologized.  [DE 27-8 at 5.]

     Zuick's ire was raised again in early December.  While Larson was out of town, her

administrative assistant began playing instrumental Christmas carols over the school intercom

before school.  [DE 27-2 at 18; DE 27-3 at 1.]  According to Zuick, when she complained, the

music was only shut off to her classroom, but continued playing throughout the rest of the

school.  [DE 27-78 at 3.]  Zuick said that after she complained, a group of teachers on a school

administrative team went to her and essentially accused her of overreacting to the "Heil Hitler"

and the Christmas music incidents.  [DE 27-8 at 3.]

     Later in December, Zuick emailed Larson and asked to be excused from an "All Student

Sing-along," at which the majority of songs were Christmas carols.  [*Id*. at 1.]  Her email also

asked that a "Staff Ham Breakfast Meeting" scheduled for January include other breakfast

alternatives, since she kept kosher and could not eat ham.  [*Id*.]  Larson responded, "The music

for the sing-along will be the same as it has been in previous years when you have attended so it

is not necessary that you be excused. . . . With regard to the [Staff] Ham Breakfast . . . [t]here

will be several alternative items for you to enjoy."  [*Id*.]  But on December 18, 2003, two days

after Larson responded to Zuick's email, Howe wrote a letter to Zuick excusing her from the

Sing-along and informing her that she had directed that only secular music be played over the

public address system.  [DE 27-9 at 1.]  She also stated that she was looking into "the other

concerns that you have brought to our attention . . . ."  [*Id*.]

     Meanwhile, Zuick went to her representative at the Indiana State Teacher's Association

(ISTA), M. Richard Miller, and to the Executive Director of the Jewish Federation for Northwest

Indiana, Michael Steinberg, to complain about the treatment she had received from Larson.  On

December 16, 2003, Miller wrote a letter to Superintendent McKay stating that Zuick, "whom

you may know is Jewish, has suffered considerable indignity and mistreatment this year."  [DE

29-2 at 1.]  He listed the "Heil Hitler" incident, the two incidents regarding Christmas carols, the

Ham Breakfast, and Zuick's claim that she was treated differently than other teachers with

respect to implementation of the school's student health policies.  He noted that Zuick had

excellent credentials and a long record of service to Portage Township Schools, and stated, "She

deserves better treatment than she has received.  I believe that her mistreatment is because she is

Jewish."  [*Id*. at 2.]  Miller requested that he and PTS attorney Dan Friel be allowed to undertake

a joint investigation.  [*Id*.]  He stated in closing, "[I]f this situation is not resolved to Mrs.

Zuick's satisfaction, I will assist Mrs. Zuick in filing a complaint with the Indiana Civil Rights

Commission."  [*Id*.]

Steinberg also wrote letters to Superintendent George McKay and the chairman of the

school board expressing distress at the "Heil Hitler" incident and requesting an investigation.

[DE 28-3 at 1.]  Assistant Superintendent Howe responded with a letter stating that while the

"Heil Hitler" comment "was not intended to hurt or be offensive, it nevertheless was

inappropriate, offensive, and unacceptable."  [DE 28-4 at 1.]  Howe wrote that "even one

incident is too many," and that Portage Township Schools had "taken this opportunity to remind

administrators" of following school policy and "fostering an environment of acceptance."  [*Id*.]

After the holidays, Howe approached Larson with the letters from Steinberg and Miller.  [DE 27-

3 at 3.]  She went through the school's harassment policy with Larson at a meeting on January 9,

2004, and memorialized her guidance to Larson in a letter on the same day.  The letter stated that while the "Heil Hitler" remark "may have been a nervous response to an action of a faculty member, it is nonetheless inappropriate, offensive, and will not be condoned by the Portage Township Schools."  [DE 27-9 at 3.]  Howe credited Larson with apologizing to Zuick, but reminded her that "you are a representative of Portage Township Schools and the Board of School Trustees has entrusted you with fulfilling School Board Policy.  You are expected to adhere to School Board Policies and conduct yourself in such a way that fosters an acceptance of diversity."  [*Id*. at 4.]

The Zuick-Larson imbroglio continued throughout the winter.  The two met with Howe, McKay, and the PTS attorney, individually and then together to try to resolve the situation.  [DE 27-3 at 6-8; DE 27-9 at 8-10; DE 27-9 at 8-10.]  Howe instructed Larson not to go into Zuick's classroom and not to talk to her personally.  [DE 27-3 at 8.]  Larson felt that things were improving, although she did call a meeting with Zuick and Myers' Home School Advisor in May to discuss what she perceived as Zuick's "second guessing" of the advisor's decisions.  [27-3 at 8-9; 27-9 at 11.]  But Zuick continued documenting her complaints, noting in one entry that Larson's memo summarizing the May meeting was "filled with distortions, insinuations, and untruths."  [DE 27-9 at 12.]

At the end of May, Debra Howe completed a performance review for Larson.  Of the 62 specific categories in which she was rated, she received 21 "Skilled" ratings, 32 "Proficient" ratings, and 9 "Needs Improvement" ratings.  [DE 27-10 at 1-3.]  Some of the "Needs Improvement" categories were:  "Has tact in dealing with others"; "Deals with others without offending"; and "Deals effectively with emotional issues."  [*Id*. at 3.]  Howe summarized:

Jane has encountered some resistance from individual teachers and has become gun shy.

5

> Jane has a tendency to become defensive and then on the offensive, sometimes in situations that do not warrant that response. She would be well served to consider the problem rather than regarding each situation as an attack. Jane doesn't shirk confrontation and would be well served to analyze her response in order to deflate confrontational situations.

[*Id.*]

In July 2004, Michael J. Berta replaced George McKay as superintendent. [DE 27-4 at 2.] Berta knew Zuick from when he was a teacher at Myers in the 1970s. [*Id.* at 3.] Berta said that he had heard rumors about the "Heil Hitler" comment at a Teachers' Association meeting during the prior school year, while he was working in Merrillville. [*Id.* at 6.]

Within days of Berta's arrival, Zuick came to him and complained about her frustrations with Larson. [*Id.* at 4-5.] On August 11, Berta met with Zuick and her husband, Howe, Miller, and Friel to discuss the situation. Zuick gave her 2003-2004 chronology to Berta at this meeting. [*Id.* at 7.] Berta met with Larson on the 12th or 13th to discuss Zuick's ongoing complaints. [*Id.* at 10.] Another meeting was held on August 31; this time, Larson and Zuick were both there, along with Howe, Miller, Friel, another school attorney, and Dave Lesich, the president of the Portage Association of Teachers. [DE 27-10 at 6.] Larson testified that all the incidents from the prior year were brought up at this meeting. [DE 27-3 at 11.] She felt that Zuick was "given the floor to personally attack me [and] attack my character." [*Id.*] According to Larson,

> [Zuick] stated in front of all these people very loudly that I was anti-Semitic, I was a racist, I was a liar. And I looked to Attorney Friel, and to Mr. Berta, and to the school personnel to interject something at that point, and nothing was said to deter these comments, and nothing was said in response. . . . It was inappropriate in a professional setting for any individual to be allowed to say those things to another employee of the school corporation.

[*Id.*]

In a memo to Berta summarizing his observations of the August 31 meeting, Rich Miller

6

remarked, "Jane does not seem to be able to accept responsibility for the fall out for some of her actions."  Referring to the "Heil Hitler" incident, he continued, "Jane is going to need to be aware of this type of fall out and try to avoid it if she is ever going to have a normal relationship with Diane."  [DE 27-11 at 2.]  He stated that Larson had voiced the expectations "[t]hat Diane will not take things so literally"; "[t]hat Diane will show respect for other people's time . . . ."; "[t]hat Diane will not use 'surveying the staff' as a means of causing disruption"; and "[t]hat Diane will respect the decisions of other professionals in the building . . . ."  [*Id*. at 2.]  In turn, Zuick's expectations were that Larson "respect her by . . . [n]ot harassing; [n]ot discriminating; [and] [n]ot being anti-Semitic," and that Larson would not hold her to separate rules from the rest of the faculty.  [*Id*. at 3.]

Despite these meetings, Zuick's complaints only intensified.  Berta testified that she emailed him about three times a week in September until he told her he could not communicate with her because the teachers' union was involved.  [DE 27-4 at 8.]  He acknowledged that Zuick "could be difficult."  [*Id*. at 9.]  He held another meeting on September 23.  [DE 27-4 at 9.]  Again, though Larson believed that things were improving, Zuick felt that the situation had stayed the same.  [DE 27-4 at 9.]

In October, Berta sent Howe back to the school to deal with another minor incident between Larson and Zuick.  [*Id*. at 10.]  Howe met with the two individually (although Zuick was accompanied by a representative of the Portage Association of Teachers), and summarized her conclusions in a memo to Berta dated November 1, 2004.  [DE 27-11 at 4-8.]  Zuick brought up a laundry list of complaints, including her belief that she had been given a disproportionate number of underperforming students, that she had not been given her messages from other people, and that Larson was ignoring her and leaving her out of the loop on pertinent matters.

7

[*Id*. at 4-7.] Howe's notes reflect that Larson generally defended her handling of the specific incidents raised by Zuick and stated that Zuick was rude and accusatory.  [*Id*. at 7-8.]  In her "fact finding" section, Howe concluded, "Fear and lack of trust continue to be an issue for both Diane and Jane."  [*Id*. at 8.]  Howe apparently concluded that Larson did leave Zuick out of the loop:  "Jane needs to communicate directly to the parties involved in the situation. . . . As the leader in the building, professional communication should be initiated and maintained by Jane." [DE 27-11 at 8.]

Berta sent memoranda to both Zuick and Larson on November 3, 2004 regarding his expectations of each with respect to the other.  In both memos, he informed the recipient that she is "expected to work with [the other] as a professional and as an individual."  [DE 27-12 at 1-2.] His memo to Zuick set forth certain expectations for her, such as being concise in her communications and using "effective judgment in knowing when to bring a conversation to close."  [*Id*. at 2.]  He also told Zuick, "It is my opinion that the teacher/principal relationship between yourself and Jane Larson does not contribute to the development of a positive atmosphere or productive working relationship at Myers School."  [*Id*. at 2.]  His memo to Larson used some of the same language, but communicated a different message:

You are expected to be the leader of the entire Myers school program and work to achieve
the goals of the district and [the] Myers School Improvement Plan.  Your collaboration as well as decision-making must keep the development and achievement of these goals as a priority.  Inherent in this leadership responsibility is "finding a way" for all staff to focus and work toward goal achievement. . . .

After multiple meetings, it is my opinion that the principal-teacher relationship between yourself and Mrs. Zuick does not contribute to the development of a positive atmosphere or productive working climate at Myers School.  It is also my opinion that both you and Diane Zuick, because of your lack of a working relationship between one another, prevent a positive atmosphere and productive working climate being realized.  As principal, you are expected to demonstrate that you have made reasonable efforts to

include Diane Zuick in work at Myers School.

[*Id.* at 1.]

Berta testified at his deposition that at the time he wrote the November 3 memo, "I was highly suspect of Mrs. Larson's ability to provide a leadership that I kept talking about that was an expectation of her at Myers."  [DE 27-5 at 1.]  In contrast, Larson testified that, whereas during the prior year the PTS administration treated her as a leader who had the authority to deal with a teacher's conduct, under Berta, the message was, "this teacher doesn't like what you're doing, or how you're doing what you're doing, so you need to try to find a way to fix that."  [DE 27-3 at 14.]  She testified that she "was not given the authority to act as I would with any other teacher."  [*Id*. at 15.]

On November 22, 2004, Zuick filled out a PTS "Sexual, Age, Racial, Ethnic, or National Origin Harassment Report Form," alleging that she had been harassed by Larson because she was Jewish.  [DE 27-12 at 4.]  She attached two binders of documentation.  [*Id.*]  Berta's initial response was that the form was merely a restatement of all of the issues that Zuick had already raised, but he informed the attorney, Friel, of the report.[1]  [DE 27-5 at  4.]  Berta testified that he did not have any indication that Larson was engaging in any sort of religious harassment or persecution of Zuick.  [DE 27-5 at 2.]

The final straw occurred in December 2004.  Berta had given Howe the directive to pull the music teachers together from all of the elementary schools in the district to come up with a standardized holiday program.  [DE 27-5 at 5.]  He said that this was in response to complaints

---

[1]  In her affidavit, Larson indicates that she asked to file a harassment complaint, evidently against Zuick, but Howe told her that she could not file a complaint under the PTS harassment policy because she was a supervisor and Zuick was non-management.  [DE 42 at 1.]

from some of the teachers that they had prepared much more material or much longer for their programs than teachers in other schools.  [*Id*.]  Larson learned at a meeting that Berta "was instituting a new diversity policy for the corporation, and that he had directed [Howe] to meet with the music teachers before the holiday programs so that the diversity policy could be incorporated into the holiday programs that year."  [DE 27-3 at 16.]

On December 6, Howe emailed the music teachers to remind them that she wanted to see the songs they had selected for the holiday program.  [DE 27-12 at 5.]  The Myers music teacher, Margie Gough, had compiled a list containing the following songs:  "Celebrate with Joy"; "Reach Out"; "Hanukkah Is Here"; "O Kwanzaa";  "Snowpants"; "Santa Claus Is Coming to Town"; "Deck the Halls"; "Jingle Bells"; "Rudolph the Red Nosed Reindeer"; "Frosty the Snowman"; "My Christmas Tree"; and "Silver Bells."  [*Id*.]  But before she responded to Howe's email, she approached Larson to discuss the list.  According to Larson:

> I told her that Dr. Howe had mentioned that she had talked with the music teachers about the diversity policy, that, you know, I was glad to see Hanukkah is Here and Oh Kwanzaa on the list, but that several teachers had come to me because . . . the teachers were aware of the songs.  And so some of the teachers and staff had come to me and said in years past, we've sung like Feliz Navidad, and done other traditional Christmas songs.  One teacher was Catholic and said, you know, I'm all for these songs, but there was just concern about if we want to reflect our population, then our diverse holiday program should also include a traditional Christmas song.

[DE 27-3 at 16.]

After the meeting, Gough replied to Howe's email with her original list of songs, which she said she was using for both Myers and Kyle, the other elementary school at which she taught.  [DE 27-12 at 5.]  Gough copied Larson on the email.  [DE 27-3 at 16.]  Several minutes later, Larson emailed Howe:

> Deb -

> I have reviewed the list of songs for the Holiday music program at Myers and am glad that we now have a Hanukkah and Kwanza [sic] song; however, if all celebrations are to be represented, a Christian Christmas song such as *Silent Night* or *Hark the Herald Angels Sing* should also be included to make the program complete.
>
> Jane

[DE 27-12 at 5.][2]

Howe went to Berta after receiving Larson's email, upset at what she perceived to be Larson speaking out of turn on an issue that was to be handled by the music teachers and Howe. On December 7, Berta sent Larson a memo stating that Larson's response concerned him, both because it "could be interpreted as an interference with the design of the holiday program song selection, which was the responsibility of the teacher," and because it was "possibly another action to irritate Mrs. Zuick."  [DE 27-12 at 6.]  He added,

> As I read and re-read your statement, I cannot understand your logic in communicating this message.  After all the sessions and discussions to attempt to build a relationship between Mrs. Zuick and yourself, I would think you would work to avoid any recommendation that could even remotely weaken what relationship exists.  The issue I am discussing here is not one of whether to include the two songs or not.  The issue is whether or not you, as principal, exercised good judgment in making the recommendation.  The teacher had clearly set the menu of songs for a holiday program and was not seeking input.  As one highly involved with you, and Mrs. Zuick, I immediately interpreted your suggestion as another indirect attempt to put Diane Zuick in her place.

[*Id*.]

On December 10, Larson sent Berta a reply.  [*Id*. at 7.]  She explained that her email had been based on feedback she had received from staff.  She denied intending to irritate Zuick, and stated that "[t]hese erroneous interpretations" of her conduct "only continue to hinder the staff and myself in improving student achievement at Myers."  [*Id*.]  She closed, "My efforts are

---

[2]  Gough ultimately put *Silent Night* on the song list, although Larson denied directing Gough to use the song.  [DE 27-3 at 16.]

meant to build a sense of community within the building by valuing all members so that we can proceed with what truly needs to be the focus, that of improvement." [*Id*.]

Berta viewed Larson's memo, in the context of her email to Howe, as insubordination. [DE 34 at 2-3.] Although he later acknowledged that the original song list was not in compliance with the diversity policy "in its pure sense" [DE 34 at 2], he stated:

> [T]he issue wasn't the inclusion or exclusion of a Christian, non-Christian, Jewish, whatever, song. The issue was based on all of the history of what had occurred here, the principal was not following what the principal had been instructed to do. And that was to take the music program list of songs generated by this group of music teachers, under the facilitation of the assistant superintendent, and deploy it at your building.

[DE 33 at 11.] He added that Larson's action, taken in isolation, would not have created a major issue, but taken in context with the ongoing complaints by Zuick, the matter could not be treated as though it was an isolated incident.[3]  [*Id*.]

Berta responded to Larson's memo by calling her in to ask for her resignation. [DE 27-3 at 17.] He told her that if she did not resign, he would ask the school board not to renew her contract. [*Id*.] He cited her "minimal" leadership as the motivation for his decision. [*Id*.] After Larson decided not to resign, Berta composed a formal letter dated December 17 to inform her that PTS was considering not renewing her contract. He again stated, "[Y]our leadership skills, in my opinion, are minimal." [DE 27-12 at 9.] He elaborated:

> You often either do not understand or are not accepting of the suggestions made to you by your supervisors. In sessions I have attended with you, you generally react to suggestions in an "I don't want to do it but I will because you told me" attitude. My opinion is that your reaction to suggestions is passive. The result is marginal progress at best. In addition, you often conduct yourself as if your supervisors at central office are

---

[3]  At his deposition, Berta testified that he did not know that Larson's motive was to persecute Zuick. [DE 27-5 at 9.] He said he could understand how Larson's actions could be construed by a Jewish person to be religious persecution, but could also understand how a person in Larson's position could construe them otherwise. [*Id*.]

your adversaries.  I sense that when a supervisor questions your actions and/or statements, you interpret this as a challenge to your person.  Your reaction is often one of unusual defensiveness as if you are being personally persecuted.  I have rarely perceived you as wanting to learn from a criticism communicated to you and designed to be constructive.  This is unacceptable and an obstacle to improvement.

[*Id*. at 8.]

The school board's next meeting was in January 2005.  At the meeting, Berta read his December 17 letter to Larson verbatim, along with a several-page statement discussing Larson's "intolerable" attitude, her failure of empathy and accountability, and her poor response to both the "Heil Hitler" incident and the more recent holiday program incident.  [DE 27-13 at 1-13; DE 27-5 at 8-9.]  He added, "Let's assume Diane Zuick is a problem.  Jane Larson did not address this assumed problem effectively.  Not only that but very serious in my opinion and experience, as the educational leader at Myers, Jane Larson did not keep the assumed problem from becoming a problem for the entire Myers staff."  [*Id*. at 5.]  The school board voted not to renew Larson's contract.  [DE 27-13 at 11.]  Larson's teaching contract remained in effect, however, and she was offered a business teaching position at Portage High School East, though she never responded to the offer.  [DE 27-13 at 13; 27-5 at 11.]

## II. DISCUSSION

### A. Motion to Strike

Larson moves to strike Diane Zuick's narrative account of her run-ins with Larson on the grounds that it is hearsay.  She also argues that portions of the affidavits of M. Richard Miller and Michael Steinberg should be excluded because they contain accusations that Larson displayed religious hostility toward Zuick, and "their accusations are solely based on the hearsay statements of Diane Zuick."  [DE 46 at 4.]

Larson's arguments miss the mark.  The evidence sought to be excluded is not being used

13

to prove the truth of Zuick's assertions, *i.e.*, that Larson discriminated against Zuick on the basis of her religion.  Whether Larson actually discriminated against Zuick is not the primary issue in this lawsuit – as the Plaintiff points out in her brief, Superintendent Berta acknowledged that he did not believe she discriminated.  What is at issue is Defendant's motivation for not renewing Larson's contract.

Out of court statements are not hearsay when they are offered to demonstrate the effect they have on the listener.  *United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002).  Both the chronology and the affidavits bear on PTS's state of mind in determining not to renew Plaintiff's contract.  Superintendent Berta testified that he reviewed Zuick's 2003-2004 chronology after the August 11, 2004 meeting.[4]  Therefore, the chronology was one of many pieces of information he had available to him in recommending nonrenewal.  Likewise, the affidavits' description of Zuick's complaints to Miller and Steinberg are not offered to substantiate those complaints, but to demonstrate that they responded by contacting PTS officials to demand an investigation.

Plaintiff's motion is therefore denied.  However, insofar as Defendant attempts to assert that Plaintiff was not meeting legitimate job expectations because she actually did discriminate against Zuick (Def.'s Br. at 17-18), the Court has not credited the Zuick chronology or the affidavits in that inquiry.

---

[4] Zuick also kept a chronology of the first part of the 2004-2005 school year, but there is no evidence that school officials reviewed it prior to this litigation.  However, Defendant is correct in its assertion that counsel for both parties used both the 2003-2004 and fall 2004 chronologies throughout the depositions of Larson and Berta for the purpose of refreshing their recollections.  Therefore, both documents are non-hearsay for purposes of establishing the chronology of meetings and understanding witness testimony about the meetings.  *Pecoraro v. Walls*, 286 F.3d 439, 444 (7th Cir. 2002) ("[A] document doesn't have to be admissible as substantive evidence in order to be used for purposes merely of impeaching a witness (or refreshing his recollection).").

**B. Summary Judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

Larson alleges that Defendant's treatment of her and her termination violated Title VII of the 1964 Equal Rights Act, 42 U.S.C. § 2000-e et seq.[5] (Compl. ¶ 32.) Title VII makes it unlawful ... for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

---

[5] Larson's complaint also asserts a claim of "reverse discrimination based on national origin" in violation of Title VII. (*Id.* ¶ 33.) This claim need not detain us long. Larson has not addressed the claim in her briefing, but the Court can only surmise that it is based on her belief that Defendant treated Zuick, who is Jewish, better than it treated her. But Larson failed to exhaust her administrative remedies on this claim, because she failed to include national origin discrimination in her EEOC charge. [DE 1-2 at 1.] Larson's national origin claim is arguably "reasonably related" to her race and religion allegations so as to overcome the exhaustion requirement. *Harper v. Godfrey Co.*, 45 F.3d 143, 147-48 (7th Cir. 1995). But we need not address that argument at greater length, because the claim fails on its merits anyway. Larson's claim that Zuick was treated better than her does not amount to a claim that Defendant discriminated against her based on her national origin – indeed, she never indicates what her national origin is. For that matter, she has not established Zuick's national origin. Although the record establishes that Zuick is Jewish, Judaism is not a national origin. *See Lapine v. Edward Marshall Boehm, Inc.*, 1990 WL 43572, at *5 (N.D. Ill. Mar. 28, 1990).

origin." 42 U.S.C. § 2000-e(a)(1).   A Title VII claim of religious discrimination can be

established either by presenting direct evidence of discrimination or by the indirect method

under the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).   Plaintiff has not introduced any direct evidence of discrimination, so we

proceed with the analysis of the indirect evidence.

Under the burden-shifting method, a plaintiff must establish a *prima facie* case of

discrimination by showing that: (1) she is a member of a protected group; (2) she was meeting

the employer's legitimate job expectations; (3) she was discharged; and (4) that another similarly

situated person who was not a member of the protected class was treated more favorably than the

plaintiff.   *McDonnell Douglas*, 411 U.S. 792; *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 750-

51 (7th Cir. 2006).   Once the plaintiff establishes a prima facie case, the burden of production

shifts to the defendant to articulate a nondiscriminatory reason for its action.   *McDonnell*

*Douglas*, 411 U.S. at 802-03.   If the defendant articulates a nondiscriminatory reason for its

action, then the plaintiff must present evidence that its stated reason is merely a pretext for

discrimination.   *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 (1993).   A plaintiff can

satisfy this burden either "directly with evidence that [the employer] was more likely than not

motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation

is not credible."   *Sarsha v. Sears Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993).   The

ultimate burden of persuasion remains with the plaintiff at all times.   *Hicks*, 509 U.S. at 507.

Plaintiff meets the first hurdle of the test; Christians, like members of other religious

groups, are a protected class.   *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1132 (7th Cir. 1992).

Obviously, she also meets the third prong, that of discharge.   But Larson fails to point to

someone who was similarly situated to her but treated differently.   As for the "legitimate

performance" prong, it makes more sense to bypass that inquiry and go directly to the issue of whether Defendant's stated reason for nonrenewal was pretextual. *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999) (court can assume that the plaintiff has met the "legitimate expectations" element of the prima facie test where that element dovetails with the issue of pretext). We conclude that nothing in the record would support a finding of pretext.

### 1. Similarly Situated

Larson claims that she is similarly situated to Zuick, and offers no other similarly situated employees with whom to compare her. In order to show that another employee is similarly situated, "a plaintiff must show that there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). "[A] court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

No reasonable jury could find that Larson and Zuick were similarly situated. Obviously, Larson and Zuick did not share the same supervisor; Larson *was* Zuick's supervisor. Nor has Larson made any showing that teachers at Myers are subject to the same standards as the principal. Naturally, the roles of each were much different: Zuick was responsible only for her classroom, and Larson was responsible for overseeing the entire school. *See Kabes v. School Dist. of River Falls*, 387 F. Supp. 2d 955, 970 (W.D. Wis. 2005) (granting summary judgment

where principal of high school was not similarly situated to teacher).

Berta's November 3, 2004 memoranda to Larson and Zuick reflect this distinction.  In both memos, he tells the recipient that she is "expected to work with [the other] as a professional and as an individual."  [DE 27-12 at 1-2.]  But his memo to Larson adds that Larson is expected to be the leader of the entire school, and that "[i]nherent in this leadership responsibility is 'finding a way' for all staff to focus and work toward school achievement."  [*Id.* at 1.]  It is apparent that, while the superintendent acknowledged that Zuick was part of the ongoing problem, he placed greater responsibility on Larson, his direct report and the person in the position of leadership, to solve it.  Because the two were in entirely different roles, it was reasonable for Berta's expectations of Larson to be higher than those of Zuick.

### 2. Pretext

Even if Larson was meeting legitimate job expectations, PTS is entitled to summary judgment unless Larson can show that its stated reason for non-renewal was pretextual.  *See Keri v. Bd. of Trustees of Purdue Univ*., 458 F.3d 620, 646 (7th Cir. 2006) (whether students' accusations of professor's unprofessional conduct were false was irrelevant; professor's supervisors determined that accusations about inappropriate behavior outweighed the positive aspects of his employment, and there was no suggestion that the supervisors themselves manufactured the accusations or believed them to be false).  She cannot.

The school board voted not to renew Larson's contract at Superintendent Berta's request. There is no evidence of the school board's deliberations on the topic, and the parties evidently agree that Berta was the person responsible for making this determination.  Berta's statement to the board gave a variety of reasons for non-renewal, none of which had anything to do with Larson's own religious beliefs.  The primary reasons he gave were Larson's lack of leadership

(reflected in an inability to resolve her personal conflict with Zuick) and her poor attitude.  The record well documents that Berta and Assistant Superintendent Howe sincerely believed that Larson was not providing effective leadership to the school, and that she displayed a bad attitude.

First, Larson had been at the school only a couple of months when she made the faux pas of referring to Hitler in a staff meeting, offending at least one teacher and creating a distraction for PTS officials as they were forced to address the issue with the Teacher's Association and a local community group.  Berta felt that an appropriate response would have been to take "extra ordinary [sic] action to resolve this terrible comment, especially after learning of a staff member's personal family experiences in Nazi death camps," but concluded that Larson's response was less than extraordinary.  [27-13 at 8.]

Over the next fourteen months or so, PTS officials were continually engaged in trying to resolve the issues between Zuick and Larson.  Whether or not Zuick's constant complaining was justified, it is evident that Larson's supervisors believed that she was unable to resolve the issue by herself.  Berta testified that the ongoing conflict had become a distraction for the entire school, such that the teachers were divided according to whether they supported Larson.[6]  He also testified that principals from other schools in the district were making comments such as, "what in the world is going on at Myers?," indicating his impression that the wider school district community perceived a problem.  [DE 27-5 at 3.]

There is also significant support in the record that Berta believed that Larson had a bad attitude.  Miller, the ISTA director, and Howe both told Berta that Larson had "trust issues" that

---

[6] Berta references a division of one-third and two-thirds, but because his deposition is truncated, it is not clear which fraction supported Larson.  [DE 27-5 at 3.]

prevented her from dealing with Zuick effectively.  Howe documented Larson's failure to communicate with Zuick regarding school issues that were relevant to her.  Berta's statement to the board also referenced Larson's skepticism with his statement at the start of the school year that his friendship with Zuick would not interfere with his handling of responsibilities as superintendent.  Finally, Berta perceived Larson as being insubordinate in going around the procedure that had been established for setting up the 2004 holiday program.

Plaintiff does not counter with any evidence to show pretext.  Where a plaintiff lacks direct evidence of pretext, she at least "must show that the employer's reason is not credible or that the reason is factually baseless."  *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007).  Although Larson's May 2004 review was generally positive, she was rated as needing improvement in being tactful and dealing with others without offending – very much the same areas that Berta cited in his recommendation of non-renewal.  But Plaintiff argues that Berta's determination was suspiciously sudden given his admission that Larson's job was not "in jeopardy" as of November 2004.  Berta's timing can hardly be seen as suspicious.  Whether or not he was actively thinking of firing Larson, he stated that, by November, he was "questioning deeply her ability to lead that school.  In addition, I was questioning what skills she was deploying to meet the expectations that had been set."  [DE 33 at 9.]  Given the substantial documentation of school officials' intervention in the ongoing problems between Larson and Zuick, the timing of Larson's termination cannot be construed as suspicious.

The only wisp of pretext the Court could draw from the record is the notion that Berta viewed Larson's "Silent Night" email as an action to irritate Zuick.  Zuick, a classroom teacher, apparently had no role in designing the holiday program and may never have learned that it was Larson who added in that carol.  However, Berta's December 7 memo clearly states that he

interpreted Larson's move as "another *indirect* attempt to put Diane Zuick in her place."  [DE 27-12 at 9 (emphasis added).]  Berta's conclusion might have been wrong, but given that Larson and Zuick had already butted heads regarding Zuick's attendance of the prior year's holiday program, Berta's conclusion is not baseless or lacking in credibility.  Moreover, the fact that PTS officials ultimately permitted the inclusion of "Silent Night" in the school program cuts strongly against Larson's claim that she was fired for her decision to include the song.  [DE 27-3 at 16.]

The thrust of Larson's argument seems to be that she should not have been terminated because she did not engage in religious harassment.  Larson suggests that if anyone engaged in harassment, it was Diane Zuick, who called her a racist and an anti-Semite.  Even if these accusations could possibly be construed to constitute harassment, they would not give Larson a cause of action against her former employer.

Nor does it matter whether Larson's true intent in objecting to the holiday program was to carry out the school's diversity policy.  It would be absurd to suggest that an employer who acts on the incorrect but sincerely-held belief that one of its managers is discriminating against her subordinate on the basis of religion itself engages in religious discrimination by terminating the manager.  Yet that is the fundamental premise of this lawsuit.  But Larson loses because Title VII does not protect an employee from termination decisions that are based on incorrect or ill-considered reasons – only decisions that are made on an impermissible basis.  *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir. 1999).

## III.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [DE 25] is **GRANTED**; Plaintiff's motion to strike [DE 38] is **DENIED**.  The Clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant and shall treat this civil action as **TERMINATED**.  All

21

further settings in this action are hereby **VACATED**.

        **SO ORDERED**.

        ENTERED: September 10, 2007

                        s/ Philip P. Simon
                        PHILIP P. SIMON, JUDGE
                        UNITED STATES DISTRICT COURT